COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

TENET HOSPITALS LIMITED, A § 
TEXAS LIMITED PARTNERSHIP,  No. 08-10-00271-CV
D/B/A SIERRA MEDICAL CENTER, §
JACLYN BROWN, R.N., TAMMY  Appeal from the
PROPHET, R.N., KAYLA CHAVEZ, §
R.N., GLORIA TOMASINO, R.N.C. AND  34th District Court
DEE DEE SHAW, R.N., §
                                                        of El Paso County, Texas
        Appellants, §
                                                        (TC# 2009-1494)
v. §

DALIA DE LA RIVA, INDIVIDUALLY §
AND AS PARENT AND NEXT FRIEND
OF DANIELLA DE LA RIVA, A MINOR, §

        Appellee.

## O P I N I O N

Tenet Hospitals Limited, d/b/a/ Sierra Medical Center, Jaclyn Brown, R.N., Tammy Prophet,

R.N., Kayla Chavez, R.N., Gloria Tomasino, R.N.C., and Dee Dee Shaw, R.N., Appellants, appeal

the trial court's denial of its motion to dismiss Dalia De La Riva's health care liability case. In two

issues on appeal, Appellants contend that the expert reports submitted by De La Riva were

inadequate and fatally deficient to maintain their case.[1] For the following reasons, we reverse.

## BACKGROUND

On January 21, 2007, Dalia De La Riva went to Sierra Medical Center, exhibiting signs of

labor. However, when her obstetrician, Dr. Julio Novoa, determined that she was not in labor, De

La Riva was discharged. Three days later, on January 24, 2007, at 1:19 a.m., De La Riva returned

to Sierra Medical Center, having contractions two to three minutes apart. She was admitted, and

---

[1] Section 74.351 provides that if a health care liability claimant does not serve an expert report within 120 days after his original petition is filed, the trial court must dismiss the claim with prejudice. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)-(b) (West 2011).

soon, it was discovered that the fetal heart rate was non-reassuring, which was indicative of lack of oxygen. That non-reassuring heart rate lasted approximately two minutes. Consequently, at 1:25 a.m., Nurse Jaclyn Brown, the labor and deliver nurse assigned to De La Riva, called Dr. Novoa. In response, Dr. Novoa ordered that De La Riva take Pitocin, a labor induction agent.

At 2:27 a.m., another non-reassuring deceleration in the heart rate occurred, and five minutes later, it occurred again. Thus, at 2:35 a.m., Nurse Brown called Dr. Novoa again. However, Dr. Novoa did not go to the hospital at that time.

At 3:35 a.m., the fetal monitor showed another non-reassuring fetal heart rate, and at 4:25 a.m., Nurse Brown noted minimal variability and a drop in the fetal heart rate. At 4:31 a.m., the fetal heart rate had an abnormal baseline with a significant deceleration. By this time, both Nurse Brown and Nurse Tammy Prophet were involved in interpreting the fetal heart rate. At 4:34 a.m., Nurse Brown documented moderate variability with accelerations. However, at 4:51 a.m., there was a pattern of marked variability. As such, Nurse Brown contacted Dr. Novoa again at 5:03 a.m. Dr. Novoa ordered an epideral but did not go to the hospital. De La Riva, however, refused the epideral, despite having signed vaginal and c-section consent forms two hours earlier.

When other decelerations occurred at 5:18 a.m., 5:22 a.m., and 5:26 a.m., Nurse Brown, at 5:52 a.m., again called Dr. Novoa. At this point, Dr. Novoa decided to go to the hospital and arrived at Sierra Medical at 6:30 a.m. Approximately fifteen minutes later, Dr. Novoa ruptured the fetal membrane to induce labor, even though the fetus was in a floating position and such procedure could cause umbilical cord complications and oxygen deprivation. Despite noting the meconium stained amniotic fluid, Dr. Novoa agreed to allow De La Riva to continue to labor naturally. However, at 7:02 a.m., Dr. Novoa noted that the fetal heart rate was bradycardic, that is, it was slowing down, and when resuscitative measures were unsuccessful, he ordered an emergency c-section. Nurse

Brown, Nurse Kayla Chavez, and Nurse Gloria Tomasino accompanied Dr. Novoa and De La Riva to the operating room.

The surgical scrub technicians, however, did not arrive in the operating room until three minutes after De La Riva's arrival. The operating room did not appear to be prepared as the nurses struggled to locate, open, and prepare surgical trays and disposable blades. Thus, the c-section was delayed approximately seven minutes. But at 7:15 a.m., the c-section was performed, and Daniella was born. Unfortunately, Daniella had no heart rate; thus, Nurse Shaw began resuscitation as a certified registered nurse anesthetist attempted intubation to establish an airway. Soon, Neonatal Nurse Jose Balderrama arrived, and by 7:24 a.m., Daniella's heart was beating less than 100 beats per minute. Believed to have suffered from hypoxic ischemic brain injury, Daniella now lives with neurological disabilities.[2]

De La Riva later filed a health care liability suit against Appellants and Tenet Healthcare Corporation, Dr. Novoa, First Choice OB/GYN Associates, Jose Balderrama, Timothy Aquilina, and Jasper Neuse, asserting various allegations based on the care and treatment rendered to her daughter.[3] As to Nurses Brown and Prophet, De La Riva claimed that they failed to appropriately monitor the fetus, recognize and document signs of distress, communicate with Dr. Novoa, and implement the chain of command. Concerning Nurses Chavez and Tomasino, De La Riva alleged that they failed to properly prepare, equip, and staff the operating room. And as to Nurse Shaw, De La Riva asserted that she failed to follow neonatal resuscitation guidelines upon receiving the infant at delivery. The

_____

[2] "Hypoxia" is the "presence of less than the normal amount of oxygen, as in the air, in the blood, in a tissue, in the lungs, etc.," and "ischemia" is a "condition in which a part of the body suffers from a lack of blood, usually because of a contraction of the blood vessels." *See* Schmidt, J.E., M.D., ATTORNEYS' DICTIONARY OF MEDICINE ILLUSTRATED, Vol. 3, H-285, I-208-208.1 (Matthew Bender 2010).

[3] The case against Timothy Aquilina and Jasper Neuse, both certified registered nurse anesthetists, was later nonsuited.

allegations against Sierra Medical were based on vicarious liability for the conduct of its nursing staff.

After timely serving experts report from Kathryn Snider, a labor and delivery nurse, Dr. Michael Kreitzer, a board certified obstetrician and gynecologist, Brigitte Grissom, a neonatal nurse, and Dr. Daniel Adler, a board certified pediatric neurologist, Appellants objected to the reports and moved to dismiss the case. Specifically, they argued that Dr. Adler was not qualified to opine on the standard of care or breach as to Appellants, nor was Dr. Kreitzer qualified to opine on the standard of care, breach, or causation as to Appellants. In addition, Appellants asserted that neither nurse was qualified to opine on causation, and that even if all the experts were qualified, their reports were inadequate as none addressed causation as to Appellants.

In response, De La Riva claimed that Dr. Adler and Nurse Snider were "highly qualified" and that their reports adequately met the statutory expert report requirements. De La Riva also attached a seven-page summary of the opinions of Nurse Snider and Dr. Adler, arguing that the combination of those two reports were adequate. At that time, De La Riva did not respond to Appellants' arguments regarding the lack of qualifications of Dr. Kreitzer, Nurse Grissom, or Nurse Snider. Subsequently, the trial court held a hearing on the motion to dismiss on May 19, 2010, and after further briefing on the matter, the trial court denied the motion.

## DISCUSSION

Appellants raise two issues on appeal. The first contends that the expert reports submitted were deficient, alleging that Dr. Adler wholly failed to address causation as to Daniella's injuries and that neither Dr. Kreitzer, Nurse Grissom, nor Nurse Snider had the knowledge or experience to offer causation opinions on Daniella's injuries. And Appellants' second issue asserts that even if we were to find that the expert reports sufficiently addressed causation, they were nonetheless conclusory and

speculative. De La Riva responds that the reports constituted a good faith effort and that a fair reading of all the reports more than meets the statutory requirements. Finding merit in Issue One, we do not address the second.

*Standard of Review*

A trial court's decision to deny a motion to dismiss under Section 74.351 is reviewed for an abuse of discretion. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Tenet Hospitals, Ltd. v. Boada*, 304 S.W.3d 528, 533 (Tex. App. – El Paso 2009, pet. denied). An abuse of discretion only occurs when the trial court acted in an unreasonable or arbitrary manner, without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Boada*, 304 S.W.3d at 533. A trial court acts arbitrarily and unreasonably if it could have reached only one decision, but instead reached a different one. *See Teixeira v. Hall*, 107 S.W.3d 805, 807 (Tex. App. – Texarkana 2003, no pet.); *Boada,* 304 S.W.3d at 533. To that end, a trial court abuses its discretion when it fails to analyze or apply the law correctly. *In re Sw. Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007), *citing In re Kuntz*, 124 S.W.3d 179, 181 (Tex. 2003); *Boada*, 304 S.W.3d at 533.

*Applicable Law*

If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, a trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West 2011). The definition of an expert report requires that the report contain a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal

relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2011). As the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document. *Palacios*, 46 S.W.3d at 878.

In setting out the expert's opinions on each of the required elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. *Id*. at 879. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Id*. And second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id*. Thus, if a report does not meet these purposes and omits any of the statutory requirements, it does not constitute a good faith effort. *Id*. Nor does a report that merely states the expert's conclusions about the standard of care, breach, and causation fulfill these purposes. *Id*. Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

However, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. The report can be informal, that is, the information contained in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id*.

### *Dr. Adler*

Appellants first argue that Dr. Adler's report was insufficient to establish causation as the report did not address how each named defendant's conduct caused the injury. "An expert report must provide a fair summary of the causal relationship between the failure of a health care provider to meet the standards of care and the injury, harm, or damages claimed." *Estorque v. Schafer*, 302 S.W.3d 19, 27 (Tex. App. – Fort Worth 2009, no pet.); *see also Wright*, 79 S.W.3d at 53. It cannot

be conclusory. *Wright*, 79 S.W.3d at 53; *Estorque*, 302 S.W.3d at 27. Rather, it must explain the basis of the expert's statements regarding causation and link his conclusions to the facts. *Wright*, 79 S.W.3d at 53; *Estorque*, 302 S.W.3d at 27-28. A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent said act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App. – San Antonio 2004, no pet.). Thus, merely providing some insight into the plaintiff's claims does not adequately address causation. *Wright*, 79 S.W.3d at 53; *Estorque*, 302 S.W.3d at 28. Accordingly, causation cannot be inferred; it must be clearly stated. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App. – El Paso 2008, no pet.). Indeed, we may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App. – Austin 2007, no pet.).

Moreover, when a plaintiff sues more than one defendant, the expert report must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6) (a claimant must provide each defendant with an expert report that sets forth the manner in which the care rendered failed to meet the standards of care and the causal relationship between that failure and the injuries claimed); *Doades v. Syed*, 94 S.W.3d 664, 671-72 (Tex. App. – San Antonio 2002, no pet.); *Rittmer v. Garza*, 65 S.W.3d 718, 722-23 (Tex. App. – Houston [14th Dist.] 2001, no pet.). An expert report may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant breached the standard of care and how that breach caused or contributed to the cause of injury. *Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 244 (Tex. App. – Corpus Christi 2004, no pet.).

Here, Dr. Adler's report notes that he reviewed the medical records, and then the report sets

out the factual recitations of what occurred on the day of Daniella's birth. In this recitation, Dr. Adler makes no mention of any of the nurses named as defendants, or what they were doing, what they did, how they participated in monitoring De La Riva, or how they aided in Daniella's delivery. The report does, however, mention Dr. Novoa, noting that "Dr. Novoa arrived at the hospital at 6:30 a.m.," and that "[h]e ruptured the membranes." The report next lists the "clinical impression" as hypoxic ischemic encephalopathy, motor and language delay, and mixed low tone-spastic quadriparesis. The report then concludes with his "formulation," which states as follows:

> Daniella De La Riva is a girl with significant and substantial neurological disabilities. She was delivered catastrophically ill at birth with a cardiac arrest. These neurological disabilities are the result of a hypoxic ischemic brain injury that occurred in the aftermath of a cardiac arrest, which was present immediately after birth. No other cause is possible.
>
> . . .
>
> A delivery prior to the onset of the bradycardia noted on fetal heart monitoring would have prevented all of Daniella's neurologically problems. An earlier delivery and prompt resuscitation would have significantly mitigated if not wholly prevented Daniella's neurologically problems.

This is deficient for causation. Looking to the four corners of the report, we note that it does not explain, identify, or describe what conduct, act or omissions are attributable to any of the Appellants, that is, the report does not explain the causal relationship between each defendant's individual acts and the injury caused to Daniella. Rather, the report would have us infer which party was responsible for each cause. But as set out in the other expert reports, each of the ten named defendants had numerous and varying responsibilities as to the two patients involved. Based on the way Dr. Adler's report is written, there is no way to discern whether he believed that Daniella's injuries were caused by the acts or omissions of the pre-delivery nurses, those nurses in the operating room, Dr. Novoa, Nurse Shaw or Balderrama, or someone else entirely. As the report fails to state

who caused the injuries, we find it deficient.[4]  *See Austin Heart*, 228 S.W.3d at 282-83 (finding expert report deficient that was "silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to [the patient]"); *Taylor*, 169 S.W.3d at 245-46 (finding expert report deficient that failed "to state what each defendant should have done in order to meet the standard of care, what each defendant failed to do, and how such failure led to [the patient's] death").

Nevertheless, De La Riva asserts that when Dr. Alder's report is read in conjunction with the reports provided by the two nurses, causation is found.  It is true that the expert report requirement may be satisfied by utilizing more than one expert report, and thus, we may read those reports together to supply missing elements.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i) (West 2011).  However, only a physician may render opinions regarding causation.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C); *see also Davis v. Webb*, 246 S.W.3d 768, 771 (Tex. App. – Houston [14th Dist.] 2008, no pet.).  Nurses cannot.[5]  *See HealthSouth Corp. v. Searcy*, 228 S.W.3d 907, 909 (Tex. App. – Dallas 2007, no pet.) (stating "it is clear [nurse] could not testify regarding causation").

Noting that law, De La Riva maintains that when the factual recitations supplied by the

---

[4]  This case is certainly unlike *IHS Acquisition No. 131, Inc. v. Crowson*, No. 08-08-00105-CV, — S.W.3d —, 2010 WL 636964, at *1, 5 (Tex. App. – El Paso Feb. 24, 2010, no pet.) (not yet reported), which involved one nurse wasting approximately ten minutes trying to determine whether the victim, who was gasping for breath, was a "DNR" patient before the staff began CPR.  There, it was clear that the expert was calling into question that one nurse's actions before the staff began resuscitative efforts.  *Id*. at *5.

[5]  De La Riva points to several cases in her briefs to support her argument that causation may be supplied from other expert reports, but all of those cases concerned reports submitted by more than one physician.  *See Packard v. Guerra*, 252 S.W.3d 511, 514 (Tex. App. – Houston [14th Dist.] 2008, pet. denied); *Perez v. Salinas*, No. 13-08-00192-CV, 2008 WL 4981565, at *1 (Tex. App. – Corpus Christi Nov. 25, 2008, pet. denied) (mem. op., not designated for publication); *Comstock v. Clark*, No. 09-07-300-CV, 2007 WL 3101992, at *1 (Tex. App. – Beaumont Oct. 25, 2007, pet. denied) (mem. op., not designated for publication); *Hiner v. Gaspard*, No. 09-07-240-CV, 2007 WL 2493471, at *1-2 (Tex. App. – Beaumont Sept. 6, 2007, pet. denied) (mem. op., not designated for publication).  None of those cases involved whether a non-physician could supply the missing causation from a physician's report.  *See id*.

reports submitted by Nurses Grissom and Snider are read in conjunction with Dr. Adler's report, we can infer who caused Daniella's injuries by failing to provide an "earlier delivery" or "prompt resuscitation." However, Dr. Adler did not reference those reports in arriving at his conclusion. Moreover, as to the "earlier delivery" allegation, Dr. Adler provided no time reference as to how much earlier the delivery should have occurred and thus, whose conduct was implicated for not securing that earlier delivery. Should it have occurred seconds, minutes, or hours before? Should it have occurred when Nurse Brown first noted the non-reassuring heart rate, when Nurse Prophet started monitoring the fetal heart rate, or when De La Riva refused Dr. Novoa's recommendation for the earlier c-section and wanted to continue to deliver Daniella naturally? And for those same reasons, whose conduct was implicated by failing to provide an earlier delivery? Was it Nurse Brown for not securing a delivery upon first noticing the non-reassuring heart rate, was it Nurse Prophet, once she started to interpret the fetal heart beats, or was it Dr. Novoa for acquiescing to De La Riva's request to continue to labor naturally?

Furthermore, the record reflects that at least two nurses engaged in resuscitation, Nurses Shaw and Balderrama. As such, we cannot determine to whom Dr. Adler was referring with his "prompt resuscitation" allegation. Was it Nurse Shaw, Nurse Balderrama, or both? We, of course, are prohibited from supplying this missing information by inference. *See Wright*, 79 S.W.3d at 52; *Austin Heart*, 228 S.W.3d at 279; *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App. – Houston [1st Dist.] 2006, no pet.). Consequently, because we cannot determine whose conduct was implicated by Dr. Adler's causation opinion, we must conclude that the report is insufficient to establish the same.

### *Dr. Kreitzer and the Nurses*

Appellants also assert that none of the remaining reports filed by De La Riva supply the

missing causation. As to Dr. Kreitzer, Appellants assert that he is unqualified to opine on the neurological injuries at issue, and as to the nurses, Appellants note that by statute, they are prohibited from rendering any opinion on causation. We have already held above that nurses, by statute, cannot render opinions on causation; thus, we will not discuss that point of error further. Accordingly, we will move on to the complaint uttered against Dr. Kreitzer.

To qualify as an expert on causation, the medical expert need not practice in the same specialty as the defendant. *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003). Rather, the expert simply must be a physician "who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C). Rule 702 of the Texas Rules of Evidence states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702.

Nevertheless, not every licensed doctor is automatically qualified to testify on every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). Thus, the trial court's inquiry should not focus on the specialty of the medical expert. *Roberts*, 111 S.W.3d at 122. Instead, the trial court should determine whether the proffered expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.2d at 153-54 (applying Texas Rule of Evidence 702); *Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App. – Houston [14th Dist.] 1999, no pet.). Therefore, a medical expert from one specialty may be qualified to testify if he has practical knowledge of what is customarily done by practitioners of a different speciality under circumstances similar to those at issue in the case. *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App. – Houston [1st Dist.] 2002, pet.

denied). Indeed, if the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care. *Id.*; *Blan*, 7 S.W.3d at 745. However, the proffered medical expert's expertise must be evident from the four corners of his report and curriculum vitae. *See generally Palacios*, 46 S.W.3d at 878; *Christus Health Southeast Texas v. Broussard*, 267 S.W.3d 531, 536 (Tex. App. – Beaumont 2008, no pet.).

Here, nothing in the four corners of Dr. Kreitzer's report indicates that he is qualified to opine on causation as to Daniella's injuries. Although Dr. Kreitzer, being board certified as an obstetrician and gynecologist, is qualified to render an opinion as to Dr. Novoa, he is not qualified to opine on the standard of care and causation as to infant hypoxia, neonatal resuscitation, and ischemic insult. Those matters appear to be within the realm of pediatric neurology. Certainly, if Dr. Kreitzer had some experience in practicing pediatric neurology, he would qualify as an expert in this regard, but neither his report nor curriculum vitae demonstrate any recent experience in perinatology. Indeed, his last experience in perinatology was more than twenty years ago, and he last wrote in that area over twenty-five years ago. Nor do the four corners of the report or curriculum vitae demonstrate that Dr. Kreitzer consulted any pediatric neurologists or recently read any medical articles or textbooks on pediatric neurology in arriving at his opinion. To qualify as an expert, the statute requires that he be "actively practicing medicine in rendering medical care services relevant to the claim." TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c)(2). Thus, experts that last practiced in the relevant field over eleven years ago have been held to be unqualified. *See Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006). At most, Dr. Kreitzer, referring almost exclusively to Dr. Novoa's conduct, was hired to opine on his conduct, not that of Appellants. His report states, "I have been hired by you to offer my expert opinions in this case regarding the care given by Dr. Julio Novoa, obstetrician/gynecologist." Thus, we cannot conclude that Dr. Kreitzer was qualified to

render a causation opinion as to Appellants' conduct. *Cf. Roberts*, 111 S.W.3d at 122 (pediatrician expert qualified when report demonstrated that he "studied the effects of pediatric neurological injuries," had "extensive experience advising parents about the effects of those injuries" and relied on the interpretation of MRIs and CT scans by a pediatric neurologist); *Livingston v. Montgomery*, 279 S.W.3d 868, 877 (Tex. App. – Dallas 2009, no pet.) (noting that obstetrician expert's report reflected that he had "knowledge and expertise to recognize the perinatal progression of hypoxia due to inadequate oxygenation through a compromised uteroplacental unit").

*Summary*

Accordingly, having found that neither Dr. Kreitzer, nor the nurses, were qualified to render expert opinions on causation as to Daniella, and that Dr. Alder's report was insufficient to establish the same, we hold that the trial court abused its discretion by overruling Appellants' motion to dismiss. Issue One is sustained.

We must now determine what relief is appropriate. The Supreme Court recently stated that when an appellate court reverses a trial court's denial of a motion to dismiss a health care liability claim due to omission of any of the statutory expert report requirements, the appellate court may remand the case to the trial court to consider granting a thirty-day extension to cure the deficiencies in the report. *Leland v. Brandal*, 257 S.W.3d 204, 207-08 (Tex. 2008); *see also Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008) (stating that a deficient report may be cured by amending the report or by serving a new report from a separate expert that cures the deficiencies in the previously filed report). Moreover, the Supreme Court has noted that the trial court is in the best position to decide whether a cure is feasible. *See Samlowski v. Wooten*, 332 S.W.3d 404, 411-12 (Tex. 2011). Thus, based on these decisions, we think it appropriate to remand the case to the trial court for consideration of whether the deficiencies can be cured, and therefore, whether to grant an

extension of time.[6]  *See Wallace*, 271 S.W.3d at 441.

**CONCLUSION**

Having sustained Appellants' first issue, we reverse the trial court's judgment and remand

for proceedings consistent with this opinion.


GUADALUPE RIVERA, Justice

June 29, 2011

Before Chew, C.J., McClure, and Rivera, JJ.

---

[6] Appellants do not seem to assert on appeal that the reports served constituted no reports at all but merely assert that the reports are inadequate and insufficient.  Thus, we do not address the "deficient versus no report at all" debate in our opinion here.  *See, e.g., Simmons v. Texoma Med. Ctr.*, 329 S.W.3d 163, 181 (Tex. App. – El Paso 2010, no pet.) (discussing the deficient versus no report debate and holding that expert report by a person unrelated to the health care field constituted no report under the health care liability statute).