**REVERSE and REMAND; and Opinion Filed August 31, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-01373-CV

## JSC LAKE HIGHLANDS OPERATIONS, LP D/B/A VILLAGES OF LAKE HIGHLANDS, METROSTAT DIAGNOSTIC SERVICES, INC., RICHARD M. WILLIAMS, M.D. AND RICHARD M. WILLIAMS, M.D., P.L.L.C., Appellants
## V.
## KAREN MILLER, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF BETTY RUTH HATHCOCK AND BETTY CROCKETT, INDIVIDUALLY, Appellees

### On Appeal from the County Court at Law No. 3
### Dallas County, Texas
### Trial Court Cause No. CC-15-00297-C

## MEMORANDUM OPINION
Before Justices Bridges, Lang, and O'Neill[1]
Opinion by Justice Bridges

Appellants JSC Lake Highlands Operations, LP d/b/a Villages of Lake Highlands (JSC),

Metrostat Diagnostic Services, Inc., Richard M. Williams, M.D., and Richard M. Williams,

M.D., P.L.L.C. filed motions to dismiss pursuant to chapter 74 of the Texas Civil Practice and

Remedies Code based on the expert reports filed by appellee Karen Miller, individually and as

representative of the Estate of Betty Ruth Hathcock and Betty Crockett, individually

(collectively Miller). The trial court denied the motions. On appeal, all four appellants argue the

trial court abused its discretion by denying their motions to dismiss because none of the expert

---

[1] The Hon. Michael J. O'Neill, Justice, retired, sitting by assignment.

reports sufficiently identify causation. JSC further argues Miller's expert reports fail to adequately state the standard of care. Because we conclude the trial court should have granted the motions to dismiss as to all three appellants, we reverse and remand this cause to the trial court for rendition of judgment dismissing with prejudice Miller's claims and for a determination of reasonable attorneys' fees and costs.

**Background**

In February 2013, Betty Ruth Hathcock was discharged from Presbyterian Hospital and admitted to JSC for rehabilitation. On March 22, 2013, around 11:45 a.m., Hathcock received a phone call from her daughter, Betty Crockett. Hathcock was slow to answer the phone, and Crockett thought Hathcock's voice sounded strange. Around 5 p.m. that same day, Hathcock told the nursing staff at JSC her dental bridge was missing. Staff searched her room but did not locate the bridge. They also told laundry staff to be on the lookout for it. JSC called Karen Miller, also Hathcock's daughter, and told her Hathcock was upset over the loss of the bridge. Miller sent her husband to JSC to look for the bridge; however, his search was unsuccessful. Miller talked to her husband and Hathcock around 7 p.m. Miller thought Hathcock's voice sounded "raspy."

By 8 p.m., Hathcock started coughing and exhibited signs of chest congestion. Dr. LeJeune ordered Robitussin and a "stat" chest x-ray. The staff did not inform him that Hathcock's bridge was missing.

Metrostat provided portable, onsite x-ray services to JSC. Casey Oaks, a radiologic technologist, took a chest x-ray of Hathcock between 9 p.m. and 10 p.m. on March 22. He forwarded the images to Dr. Richard M. Williams for review. Dr. Williams's report noted that Dr. LeJeune ordered the chest exam because of a cough. Dr. Williams's findings stated, "The heart is normal in size and configuration. The aorta and other mediastinal structures are in the

midline. There is bilateral lower lobe infiltrate." His report did not mention any foreign object in the proximal trachea.

The record does not indicate when Dr. Williams sent his final report to JSC, but the first mention of the chest x-ray in nursing notes was around 6:30 a.m. on March 23. It states the doctor was notified of the results and ordered 500 mg of Levoquin.

JSC staff found Hathcock unresponsive in her room at approximately 7:10 a.m. Hathcock was transported to the hospital and upon her arrival, she was unresponsive, hypotensive, and having seizure-like movements. When ER doctors tried to intubate, they discovered the missing bridge lodged in her throat. After the bridge was extracted, Hathcock was transferred to ICU. Despite aggressive treatment and support, Hathcock did not improve and her family requested removal of life support. Hathcock died at approximately 2 p.m. Her death certificate listed pulmonary edema, pneumothorax, and aspiration as the causes of death.

Miller filed suit under the Texas Medical Liability Act against JSC, Metrostat, and Dr. Williams and his professional corporation alleging various breaches of the applicable standards of care, which proximately caused her mother's death. Miller argued the delay in discovering Hathcock's bridge led to her death.

Miller filed four expert reports in support of her claims: (1) Dr. Teresa Albright opined on JSC's conduct; (2) Dr. David Naeger opined on Dr. Williams's conduct; (3) Dr. Ravi Patel's opinion did not reference any specific individual's conduct but discussed causation; and (4) Christi Carter, M.S.R.S., RT(S), CIIP opined on Metrostat's conduct. Appellants filed objections and moved to dismiss the suit for failure to serve adequate expert reports under section 74.351 of the Texas Civil Practice and Remedies Code. After a hearing, the trial court sustained the objections and granted Miller a thirty-day extension to cure the deficient reports.

Miller served amended reports, and appellants again moved to dismiss for failing to satisfy the requirements of section 74.351. The trial court held a hearing and denied appellants' motions to dismiss. This interlocutory appeal followed.

## Standard of Review and Applicable Law

We review a trial court's decision on a motion to dismiss under section 74.351 of the Texas Civil Practice and Remedies Code for an abuse of discretion. *Kelly v. Rendon*, 255 S.W.3d 665, 672 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The trial court abuses its discretion if it acts unreasonably, arbitrarily, or without reference to any guiding rules or principles. *Id.* We may not reverse a trial court's discretionary ruling simply because we may have decided it differently. *Id.*

Trial courts are instructed that they "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with [the Act.]" TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West Supp. 2015). Under the statute, the expert report must provide a "fair summary" of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the defendant physician or healthcare provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6).

The causation requirement is met if the report explains the basis of the expert's statements, linking his conclusions to the facts. *Christus Spohn Health Sys. Corp. v. Lackey*, No. 13-10-00222-CV, 2010 WL 3279706, at *2 (Tex. App.—Corpus Christi Aug. 19, 2010, no pet.) (mem. op.). Causation may not be inferred; therefore, a conclusory report does not meet the statutory requirements of chapter 74. *See Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.—El Paso 2008, no pet.); *see also Lackey*, 2010 WL 3279706, at *2.

An expert report need not marshal all of the plaintiff's proof, but it must include the expert opinion on each of the elements identified in the statute. *Kelly*, 255 S.W.3d at 672. The report must provide only enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *Kelly*, 255 S.W.3d at 672.

In deciding whether the statutory standard has been met, the trial court examines only the four corners of the expert's report and curriculum vitae. *Kelly*, 255 S.W.3d at 672. A court may not fill gaps in a report by drawing inferences or guessing what the expert meant or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.). With this standard in mind, we consider the expert reports filed against each appellant.

### Dr. Patel's Expert Report

Because Miller relied partly on Dr. Patel's expert report for causation as to all four appellants and all four appellants argue his report is insufficient as to causation because it does not address how each named defendant's conduct caused the injury, we begin by determining the sufficiency of this report.

A causal relationship is established in an expert report by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that absent the act or omission, the harm would not have occurred. *Nexion Health at Garland, Inc. v. Townsend*, No. 05-15-00153-CV, 2015 WL 3646773, at *4 (Tex. App.—Dallas June 12, 2015, pet. denied) (mem. op.). An expert may show causation by explaining a chain of events that begins with the defendant health care provider's negligence and ends in injury to the plaintiff. *McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.). While a claimant is not required to conclusively prove the case through preliminary expert reports, the reports may not merely state

conclusions but must link the causation opinions to the alleged breach. *Townsend*, 2015 WL 3646773, at *4. Merely providing some insight into the plaintiff's claims does not adequately address causation. *Tenet Hosps. Ltd. v. De La Riva*, 351 S.W.3d 398, 404 (Tex. App.—El Paso 2011, no pet.).

Further, when a plaintiff sues more than one defendant, the expert report must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury. *Id*.; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6) (a claimant must provide each defendant with an expert report that sets forth the manner in which the care rendered failed to meet the standards of care and the causal relationship between that failure and the injuries claimed). An expert report may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant breached the standard of care and how that breach caused or contributed to the cause of injury. *Tenet Hosps. Ltd.*, 351 S.W.3d at 404.

Here, Dr. Patel's report does not reference multiple defendants but rather does not identify *any* of the alleged responsible defendants in this case. His report provides the following opinion as to Hathcock's death:

> Ms. Hathcock expired on March 25, 2013. Her final diagnosis was cardiorespiratory failure secondary to anoxic brain injury secondary to cardiac arrest. Had the lodged denture implant been timely discovered and had she received appropriate treatment to remove the denture implant at an earlier stage, it is reasonably medically probable that Ms. Hathcock would have survived.

> It is my medical opinion, based upon my care and treatment of Ms. Hathcock and in all reasonable medical probability, that the denture implant lodged in the throat/trachea area of her airway was the cause of the aspiration which produced the pulmonary edema and pneumothorax which, collectively, was a proximate cause of death.

This is deficient for causation. Looking to the four corners of the report, as we must, Dr. Patel's report does not explain, identify, or describe what conduct, act, or omissions are attributable to any of the appellants, that is, the report does not explain the causal relationship between any of the appellants's individual acts and Hathcock's injury. *See Eichelberger v. St. Paul Med. Ctr.*, 99 S.W.3d 636, 639 (Tex. App.—Dallas 2003, pet. denied) (concluding expert report did not meet statutory requirements when it failed to mention any defendants by name or summarize the ways they breached the standard of care or caused plaintiff's injuries). Rather, the report would have us infer which party was responsible and caused the injury. We may not make such inferences. *See Austin Heart, P.A.*, 228 S.W.3d at 282.

We are unpersuaded by Hathcock's argument that Dr. Patel's report should be read in conjunction with the other expert reports to fulfill the requirements of chapter 74. It is true that the expert requirement may be satisfied by utilizing more than one expert report, and thus, we may read those reports together to supply the missing elements. TEX. CIV. PRAC. REM. CODE ANN. § 74.351(i). However, Dr. Patel's report does not state that he reviewed any of the other expert reports in reaching his conclusions. *See Tenet Hosps. Ltd.*, 351 S.W.3d at 405 (concluding report was insufficient to support causation, in part, because expert did not reference other reports in arriving at his conclusion and court would not infer who caused injuries). His report does not indicate he knew that Hathcock was a patient at JSC, that Metrostat took the x-ray, or that Dr. Williams read and interpreted the x-ray. Consequently, because we cannot determine whose conduct Dr. Patel's causation opinion implicates, we must conclude the report is insufficient to establish the same. *See Bogar v. Esparza*, 257 S.W.3d 354, 364 (Tex. App.—Austin 2008, no pet.) (concluding expert report deficient when it failed to identify in any way the person whose conduct was the subject of opinions "because it would require the reader to infer or make an educated guess as to whose actions the expert is complaining").

–7–

In reaching this conclusion, we also note in the original hearing on the motions to dismiss, the trial court raised concerns about the conclusory nature of Dr. Patel's report and suggested to Miller's attorney, "It's only going to take him a couple of sentences" to explain the sequence of events that caused her death. The trial court allowed for a thirty-day extension for Miller to amend Dr. Patel's report.

After filing an amended report, the court held another hearing. During that hearing the trial court made it clear that it was not concerned with Dr. Patel's report, but believed that the remaining physicians' expert reports were sufficient standing alone or that Dr. Albright's causation opinion was sufficient to "fill the gaps" between the defendants. Thus, although it does not appear the trial court relied on Dr. Patel's expert report, to the extent it may have, we conclude the trial court abused its discretion. We now consider whether the remaining expert reports satisfy the requirements of chapter 74 as to Metrostat, JSC, and Dr. Williams.

**Metrostat**

In support of her claim against Metrostat, Miller relied on the expert reports of Dr. Patel and Christi Carter, M.S.R.S., RT(S), CIIP. In a single issue, Metrostat argues the trial court abused its discretion by denying its motion to dismiss because the reports do not provide a valid causation opinion.

As discussed above, Dr. Patel's opinion may not be used to satisfy causation because the report neither discusses Metrostat nor states Dr. Patel reviewed Carter's expert report in reaching his conclusions. *See Tenet Hosp. Ltd.*, 351 S.W.3d at 405; *Eichelberger*, 99 S.W.3d at 639. Carter's opinion, while it discusses Metrostat's standard of care and alleged breaches of the standard of care, is inadequate to establish causation because she is not a physician; therefore, she is not qualified to provide a causation opinion. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(C), 74.401(g). Thus, Miller did not file any expert report sufficiently linking the

–8–

alleged breaches of the standard of care to any conduct by Metrostat that proximately caused Hathcock's injuries. Accordingly, Miller failed to comply with the expert report requirements of Chapter 74. Because Miller failed to comply with the expert report requirements of chapter 74, the trial court abused its discretion by denying Metrostat's motion to dismiss.

In reaching this conclusion, we are mindful of the fact the record indicates the trial court read Dr. Albright's opinion in conjunction with Carter's opinion to establish causation as to Metrostat. However, Miller has not argued in response on appeal that Dr. Albright's opinion is sufficient to establish causation as to Metrostat. Moreover, Dr. Albright's expert report analyzed the "care and treatment provided by [JSC]," and made no mention of Metrostrat. As such, we shall not consider Dr. Albright's report.

We sustain Metrostat's issue. Accordingly, we reverse the trial court's order denying Metrostat's motion to dismiss. We remand this cause to the trial court for rendition of judgment dismissing with prejudice Miller's claims against Metrostat and for a determination of Metrostat's reasonable attorneys' fees and costs. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(1), (2).

### Dr. Williams

In support of her claim against Dr. Williams in the trial court, Miller relied on the expert reports of Dr. Patel and Dr. Naeger to establish causation. On appeal, she further argues Dr. Albright's report supports causation. Dr. Williams contends none of the reports provide an adequate expert opinion as to causation because they provide nothing more than conclusory statements. Moreover, he argues Dr. Albright is not qualified to give an expert opinion as to causation.

Having concluded that Dr. Patel's expert report is insufficient, we address only the adequacy of Dr. Naeger's and Dr. Albright's reports. We begin with Dr. Naeger's report, in

–9–

which Dr. Williams specifically challenges his causation opinion as conclusory and not linked to any of his conduct.

Miller alleged in her original petition that Dr. Williams "failed to detect and report the high density foreign object" in the March 22, 2013 chest x-ray and "failed to contact and alert the ordering provider on any immediate basis of the need for an intervention for removal of [the] foreign object," thereby proximately causing Hathcock's death. Dr. Naeger's report states Dr. Williams did not meet the applicable standards of radiologic care by "failing to detect and report the high density foreign object" and "failing to contact and alert the ordering provider on an immediate basis of the need for an intervention for removal of a foreign object to prevent possible harm."[2] He stated by not identifying the foreign object and calling the ordering provider, "this delayed a timely removal of the object." Dr. Naeger further opined:

> Not removing the foreign body in a timely manner can lead to aspiration, which can be deadly. Aspiration was listed on Ms. Hathcock's death certificate as one of the "significant conditions contributing to death."

> In my opinion, the failure to meet these minimum standards of care were negligence. Further, my interpretation of the subsequent chest X-rays taken at Doctor's Hospital, as outlined and discussed in my report, are consistent with the conditions stated in the death certificate as the cause of Ms. Hathcock's death.

In reviewing whether an expert report addresses the causal relationship between the health care provider's failure to meet the applicable standard of care and the injury, there are no "magical words" required to establish causation. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) (per curiam). Rather, a causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that absent the act or omission, the harm would not have occurred. *Townsend*, 2015 WL 3646773, at *4. An

---

[2] Dr. Williams does not challenge these opinions as to the standard of care.

–10–

expert may show causation by explaining a chain of events that begins with the defendant health care provider's negligence and ends in injury to the plaintiff. *McKellar*, 367 S.W.3d at 485. While a claimant is not required to conclusively prove the case through preliminary expert reports, the reports may not merely state conclusions but must link the causation opinions to the alleged breach. *Townsend*, 2015 WL 3646773, at \*4.

Here, Dr. Naeger's opinion stops short of stating that Dr. Williams's conduct caused or contributed to Hathcock's death. Rather, he stated, "Not removing the foreign body in a timely manner *can* lead to aspiration, which *can* be deadly." Such statements are conclusory and fail to establish the alleged negligent act or omission was "a substantial factor in bringing about the harm." *See Clapp v. Perez*, 394 S.W.3d 254, 261–62 (Tex. App.—El Paso 2012, no pet.). Dr. Naeger failed to explain how Dr. Williams's failure to detect and report the bridge caused Hathcock's injury. While it is tempting to infer that Dr. Williams's alleged breach precluded Hathcock from obtaining a quicker diagnosis, thereby receiving medical treatment sooner, we cannot make such inferences. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 53. Rather, the report must include the required information within its four corners. *Id*. Instead, Dr. Naeger's opinion is nothing more than his conclusion that the breach caused the injury. He simply opines that one event caused another without explaining how the failure to detect and timely remove the bridge resulted in aspiration and ultimately her death. *See, e.g.*, *Clapp*, 394 S.W.3d at 261–62 (concluding report insufficient to establish causal link when expert simply opined that had doctor placed a nasal-gastric tube prior to surgery the contents of patient's stomach would have emptied and prevented aspiration that eventually occurred and led to, among other things, aspiration pneumonia and death). As such, Dr. Naeger's report fails to explain the basis of his statements linking his conclusions to the facts. We conclude Dr. Naeger's report is conclusory, and therefore deficient, as to Miller's negligence claims against Dr. Williams.

–11–

We now consider whether Dr. Albright's expert report is sufficient under chapter 74 to establish causation. Although Dr. Albright's report does not mention Dr. Williams by name, she states she reviewed, in addition to other documents, Dr. Williams's medical records and the radiology films and report from Metrostat. She also references the "radiologist" and the "radiologist narrative" in the section titled, "MEDICAL FACTS OF THIS CASE." While the more prudent practice is to specifically identify the doctor whose conduct is questioned in the expert report, Dr. Williams is the only radiologist involved in this suit; therefore, based on the facts of this case, Dr. Albright's report has sufficiently identified Dr. Williams. *See Troeger v. Myklebust*, 274 S.W.3d 104, 110 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("a report does not fail to implicate a defendant's conduct solely because the defendant is not identified by name"); *Bogar*, 257 S.W.3d at 364 (where a defendant is not identified at least in some manner within the "four corners" of the report, the report is deficient for that reason alone). Thus, we may consider her opinions in determining whether Miller has satisfied the causation requirements of chapter 74 as to Dr. Williams.

Dr. Albright's report states, in relevant part, the following:

> There is no mention of the appearance of a foreign object in the throat area contained within the radiologist medical narrative, which, when I was able to review copies of the X-Rays several months after my original review of this case, was clearly visible. There is no record of whether this result was called to the facility by the radiologist. . . . Had the radiologist medical narrative accurately identified the appearance of a foreign object in the throat area and, had such information been timely reported by the [JSC] staff to the treating doctor, Ms. Hathcock's whole course of care and treatment would have probably changed as she most likely would have been immediately transported to a hospital on an emergent basis. A more timely assessment of Ms. Hathcock's throat area would have been critical to an earlier extraction of the foreign object and, in all reasonable medical probability, would have saved her life.

> CONCLUSION

As the medical records reflect, Ms. Hathcock's swallowing of her dental bridge required emergent care. The delay of her receiving proper medical attention was critical to Ms. Hathcock's condition which led to her untimely death. It is my medical opinion, based upon reasonable medical probability, had the dental bridge been recognized and assessed in Ms. Hathcock at an earlier and timelier manner and had she received the necessary emergent medical treatment to extract the dental bridge from her throat area, she would have likely survived. Further, it is my medical opinion, the dental bridge embedded in Ms. Hathcock's throat area was a cause of the aspiration, pulmonary edema and pneumothorax as stated in the death certificate and was a proximate cause of her death.

Her opinion is similar to that which the Texas Supreme Court found conclusory in *Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48 (Tex. 2002) (per curiam). In that case, Wright sustained injuries in a car accident and while at Bowie, a physician assistant x-rayed her knee and foot and diagnosed her with a fractured patella, but misread her foot x-ray and failed to discover she also fractured her foot. *Id.* at 50. Nearly a month after the accident, her orthopedic surgeon discovered her fractured foot. *Id.* She filed suit against Bowie, the physician assistant, and a doctor for medical malpractice because, among other things, they failed to review the diagnostic tests her and diagnosis foot fracture. *Id.* Wright filed an expert report in which the doctor stated, in part, "If the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome." *Id.* at 52–53. Bowie argued the causation opinion was conclusory because it did not explain how Bowie's failure to correctly read or act upon the x-rays caused her injury. *Id.* at 53. The Texas Supreme Court agreed. The court determined the report did not represent a good-faith effort to summarize the causal relationship between Bowie's breach of the standards of care and Wright's injury "because the report simply opines that Barbara might have had 'the possibility of a better outcome' without explaining how Bowie's conduct caused injury to Barbara." *Id.* It concluded, "Because the report lacks information linking the expert's conclusion (that Barbara

–13–

might have had a better outcome) to Bowie's alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory." *Id.*

Similarly, Dr. Albright's report states, "[B]ased upon reasonable medical probability, had the dental bridge been recognized and assessed in Ms. Hathcock at an earlier and timelier manner and had she received the necessary emergent medical treatment to extract the dental bridge from her throat area, she would have likely survived." This statement fails to link her conclusion (that Hathcock would have likely survived) to Dr. Williams's alleged breach (not identifying the dental bridge in the x-ray and contacting the ordering provider).

In reaching this conclusion, we are mindful that Dr. Albright stated in the "MEDICAL FACTS OF THE CASE" section of the report that if the information had been "timely reported" Hathcock's "whole course of care and treatment would have probably changed as she most likely would have been immediately transported to a hospital on an emergent basis," and a "more timely assessment of Ms. Hathcock's throat area would have been critical to an earlier extraction of the foreign object and, in all reasonable medical probability, would have saved her life." However, we have previously held expert reports fail to establish causation when they do not explain how the failure to evaluate and timely manage a patient would have prevented or lessened the injury, and we cannot make such inferences. *See Hollingsworth v. Springs*, 353 S.W.3d 506, 523 (Tex. App.—Dallas 2011, no pet.) (expert report failed to establish causation when it did not explain how the timely solicitation of assistance would have avoided or mitigated hypoxic brain injury); *see also Knightstep v. Jeffers*, No. 05-12-01067-CV, 2013 WL 3487933, at *3–4 (Tex. App.—Dallas July 10, 2013, no pet.) (mem. op.) (expert report failed to establish causation when it did not explain how the timely examination and intervention or additional testing by doctor would have prevented worsening of hypoxia); *Mitchell v. Satyu*, No. 05-14-

–14–

00479-CV, 2015 WL 3765771, at *7 (Tex. App.—Dallas June 17, 2015, no pet.) (mem. op.) (expert report failed to establish causation when it did not provide a "temporal insight" as to when transfer of patient to an ICU setting was needed in order for conditions to remain treatable and reversible). Here, Dr. Albright fails to explain "how and why" Dr. Williams's failure to timely identify the bridge in the x-ray, thereby causing its delayed extraction, resulted in the aspiration that allegedly caused pulmonary edema and pneumothorax. While she makes the broad and sweeping statement that had Dr. Williams's report "accurately identified the foreign object" Hathcock's "whole course of care and treatment would have probably changed," this is nothing more than her conclusion that Dr. Williams's breach caused the injury. She fails to explain the underlying facts necessary to link the delay in identifying and removing the bridge to the ultimate outcome.

While our conclusion should not be interpreted to mean experts are required to specify an exact time in which diagnosis or treatment must occur to establish when a better outcome would likely have happened, a report that simply states a healthcare provider's failure to timely assess a condition or a healthcare provider's delayed diagnosis caused an injury, without more, is not sufficient to satisfy the requirements of chapter 74. This is particularly true in this case because it involves multiple actions by multiple defendants over a twenty-one hour period. Accordingly, Dr. Albright's expert report is insufficient to supply the causation link necessary to support Miller's claims against Dr. Williams. As such, the trial court abused its discretion by denying Dr. Williams's motion to dismiss.

We sustain Dr. Williams's issue. Because we have concluded Dr. Albright's opinions are insufficient as to causation, we need not address Dr. Williams's argument that Dr. Albright is not qualified to render such opinions. *See* TEX. R. APP. P. 47.1. Accordingly, we remand this cause to the trial court for entry of judgment dismissing with prejudice Miller's claims against Dr.

–15–

Williams and for a determination of reasonable attorneys' fees and costs. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(1), (2).

## JSC

In support of her claim against JSC, Miller relied on the expert reports of Dr. Albright and Dr. Patel. In two issues, JSC challenges the adequacy of both reports and argues regardless of whether the reports are read individually or together, neither states the applicable standards of care nor causally connects the alleged breaches of the standard of care to the injuries; therefore, the trial court abused its discretion by denying its motion to dismiss. Having concluded that Dr. Patel's expert report is insufficient, we address only the adequacy of Dr. Albright's report.

Dr. Albright opines that JSC breached numerous standards of care. These breaches include (1) failing to check her throat for the missing bridge and/or failing to notify Dr. LeJeune of the missing bridge; (2) ignoring Miller's request to transport Hathcock to the hospital; (3) failing to follow up on a "stat" chest x-ray and timely deliver the results to Dr. LeJeune; (4) failing to monitor her condition for approximately eight hours; and (5) creating discrepancies in nursing documentation. As part of her conclusion, she then states, "This negligence caused a delay of almost eleven (11) hours in her receiving medical assessment and necessary critical emergent care which was the proximate cause of the death of Ms. Hathcock."

As we concluded above with respect to her causation opinion as to Dr. Williams, Dr. Albright's report also fails to provide the causal link between JSC's alleged breaches of any standard of care and Hathcock's death. An expert report fails to establish causation when it does not explain how the failure to evaluate and timely manage a patient would have prevented or lessened the injury, and we cannot make such inferences. *See Hollingsworth*, 353 S.W.3d at 523; *see also Knightstep*, 2013 WL 3487933, at \*3–4; *Mitchell*, 2015 WL 3765771, at \*7. Here, Dr. Albright fails to explain "how and why" any of the alleged breaches of the standards of care

–16–

by JSC caused delayed extraction of the bridge thereby resulting in aspiration, pulmonary edema, and pneumothorax. Rather, her statements are nothing more than her conclusion that JSC's breaches caused the injury.

For example, she cites 42 C.F.R. § 483.75(k) to explain the standard of care for radiology and diagnostic services. Section 483.75(k) states, "The facility must provide or obtain radiology and other diagnostic services to meet the needs of its residents. The facility is responsible for the quality and timeliness of the services." However, Dr. Albright's report does not explain how quickly a "stat" x-ray should occur once a doctor gives such orders or why a "stat" x-ray ordered at 8 p.m. and performed at 9:38 p.m. is untimely. She also fails to explain how an earlier x-ray would have changed the outcome. Moreover, she states JSC was responsible for the timeliness of the x-ray *results*. Under 42 C.F.R. 483.75(k), the facility is responsible for the timeliness of the *services*, not results.

Dr. Albright also cites to 42 C.F.R. § 483.75(j)(2)(iii), which states, "The facility must promptly notify the attending physician of the findings." However, even if JSC had received the report earlier and promptly informed Dr. LeJeune of its findings, the report did not indicate the dental bridge was embedded in Hathcock's throat. Thus, receiving the report earlier would not have resulted in Hathcock "most certainly" being transported to the emergency room and receiving "immediate medical treatment, preventing her decline and death which occurred."

Dr. Albright also states JSC breached the standard of care by failing to check Hathcock's throat for the bridge and failing to notify Dr. LeJeune that it was missing "so he had a complete picture of Ms. Hathcock's situation," and these failures contributed to the delay ultimately leading to her death. However, Dr. Albright's report states a JSC nurse sent a note to Dr. LeJeune at 8 p.m. explaining Hathcock had "cough and congestion, 96% $O_2$ saturation on room air, normal respiratory rate, blood pressure, and pulse." The nurse then received orders from Dr.

–17–

LeJeune for Robitussin DM and a "stat" chest x-ray. Again, Dr. Albright does not explain how or why Dr. LeJeune's course of treatment would have been different had he known Hathcock lost her bridge.

Dr. Albright's opinions that JSC failed to monitor Hathcock's condition and did not keep accurate records regarding her condition are conclusory statements that simply state nothing more than JSC's breaches caused the injury. She fails to explain how monitoring Hathcock's condition or keeping accurate records would have resulted in earlier extraction of the bridge and prevented aspiration, pulmonary edema, and pneumothorax. We acknowledge her report indicates Hathcock's condition went from "cough and congestion, 96% $O_2$ saturation on room air, normal respiratory rate, blood pressure, and pulse" to "coughing and had wet lung sounds, with 75% $O_2$ saturation" during the alleged eight hours she was unmonitored. However, the report neither explains the significance of the drop in oxygen levels during that time and how it relates to aspiration, pulmonary edema, and pneumothorax—the ultimate cause of death—nor provides a temporal insight into when earlier monitoring could have changed the outcome. *See, e.g.*, *Mitchell*, 2015 WL 3765771, at *7 (expert report failed to establish causation when it did not provide a "temporal insight" as to when transfer of patient to an ICU setting was needed in order for conditions to remain treatable and reversible).

Lastly, Dr. Albright opines, "It was below the standard of care for the staff at [JSC] to ignore the [family] request and choose not to transport Ms. Hathcock to the ER, but instead wait on the X-ray result." She then concludes, "The failure to comply with this request caused a delay in Ms. Hathcock's receiving lifesaving care which was a proximate case of her untimely death." First, we agree with JSC's argument that Dr. Albright fails to provide the specificity required for the standard of care as to this allegation. Identifying the standard of care is critical because whether a defendant breached his or her duty to a patient cannot be determined without

specific information about what the defendant should have done differently. *Senior Care Ctrs, LLC v. Shelton*, 459 S.W.3d 753, 757 (Tex. App.—Dallas 2015, no pet.). Here, Dr. Albright's statement that it was below the standard of care for JSC to ignore Miller's request to transport Hathcock to the hospital does not explain what the standard of care is in such a situation but rather states in a conclusory fashion its actions were below some unarticulated standard. Her report fails to explain why a healthcare provider should ignore a doctor's orders to wait for x-ray results and instead follow the orders of a family member.

In addition, Dr. Albright fails to provide a causal link, outside of conclusory statements, that JSC's failure to follow the family's request caused the delay in Hathcock's treatment resulting in her death. Her report provides no insight into when transfer of Hathcock to a hospital setting was necessitated in order for her condition to be reversible. *See, e.g.*, *Mitchell*, 2015 WL 3765771, at *7. As previously stated, our conclusion should not be interpreted to mean experts are required to specify an exact time in which transfer to the hospital must occur to establish when a better outcome would have likely happened. However, a report that simply states a healthcare facility's failure to timely assess a condition or delay of a diagnosis caused an injury, without more, particularly in this case in which there are multiple actions by multiple defendants over a twenty-one hour period, is not sufficient to satisfy the requirements of chapter 74.

Accordingly, Dr. Albright's expert report is insufficient to supply the causal link necessary to support Miller's claims against JSC. As such, the trial court abused its discretion by denying JSC's motion to dismiss.

We sustain JSC's second issue. Because we have concluded Dr. Albright's opinions are insufficient as to causation, we need not address its remaining arguments challenging the standard of care. TEX. R. APP. P. 47.1. Accordingly, we reverse and remand this cause to the

–19–

trial court for rendition of judgment dismissing with prejudice Miller's claims against JSC and for a determination of reasonable attorneys' fees and costs. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(1), (2).

## Conclusion

Having found in favor of appellants, we reverse and remand this cause to the trial court for rendition of judgment dismissing with prejudice Miller's claims against JSC, Metrostat, and Dr. Williams and the P.L.L.C. and for a determination of reasonable attorneys' fees and costs pursuant to section 74.351(b) of the Texas Civil Practice and Remedies Code.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

O'Neill, J., concurring in part and dissenting in part.

151373F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JSC LAKE HIGHLANDS OPERATIONS,
LP D/B/A VILLAGES OF LAKE
HIGHLANDS, METROSTAT
DIAGNOSTIC SERVICES, INC.,
RICHARD M. WILLIAMS, M.D. AND
RICHARD M. WILLIAMS, M.D., P.L.L.C.,
Appellants

No. 05-15-01373-CV     V.

KAREN MILLER, INDIVIDUALLY AND
AS REPRESENTATIVE OF THE ESTATE
OF BETTY RUTH HATHCOCK AND
BETTY CROCKETT, INDIVIDUALLY,
Appellees

On Appeal from the County Court at Law
No. 3, Dallas County, Texas
Trial Court Cause No. CC-15-00297-C.
Opinion delivered by Justice Bridges.
Justices Lang and O'Neill participating.

     In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for rendition of judgment dismissing with prejudice appellees' claims and for a determination of appellants' reasonable attorneys' fees and costs.

     It is **ORDERED** that appellants JSC LAKE HIGHLANDS OPERATIONS, LP D/B/A VILLAGES OF LAKE HIGHLANDS, METROSTAT DIAGNOSTIC SERVICES, INC., RICHARD M. WILLIAMS, M.D. AND RICHARD M. WILLIAMS, M.D., P.L.L.C. recover their costs of this appeal from appellees KAREN MILLER, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF BETTY RUTH HATHCOCK AND BETTY CROCKETT, INDIVIDUALLY.

Judgment entered this 31st day of August, 2016.