# Supreme Court of Texas

No. 21-0470

Collin Creek Assisted Living Center, Inc. d/b/a DaySpring
Assisted Living Community,

*Petitioner*,

v.

Christine Faber, Individually and as Heir at Law of Carmelina
"Millie" Smith, Deceased,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued October 5, 2022**

JUSTICE BUSBY delivered the opinion of the Court, in which Chief
Justice Hecht, Justice Blacklock, Justice Bland, Justice Huddle, and
Justice Young joined.

JUSTICE YOUNG filed a concurring opinion, in which Justice
Blacklock joined.

JUSTICE BOYD filed a dissenting opinion, in which Justice
Lehrmann and Justice Devine joined.

This case presents an often-litigated issue: whether a cause of action arising in the health care context is a "health care liability claim" under the Texas Medical Liability Act, which requires a plaintiff to submit an early expert report. Here, a resident of an assisted living facility was seated backward on a rolling walker that a facility employee was pushing along a sidewalk by the parking lot. When the walker rolled over a crack in the sidewalk, it tipped, the two fell, and a week later, the resident died. The resident's daughter sued the facility and later amended her petition so it alleged only a cause of action for premises liability. The facility moved to dismiss for failure to file a timely expert report.

We hold that the cause of action is a health care liability claim because it meets the applicable factors we articulated in *Ross v. St. Luke's Episcopal Hospital*, 462 S.W.3d 496 (Tex. 2015). Because the plaintiff failed to serve a timely expert report, her claim must be dismissed. We reverse the court of appeals' judgment, render judgment dismissing the claim, and remand the case to the trial court for an award of attorney's fees, as required.

## BACKGROUND

Defendant Collin Creek, which does business as DaySpring, is a licensed Type-B assisted living facility. It must assist each resident with activities identified on the resident's individual service plan "related to the care of [their] physical health," which may include "transferring/ambulating." 40 TEX. ADMIN. CODE § 46.41(b)(1), (b)(1)(H).

2

Carmelina "Millie" Smith was a new resident at DaySpring with a history of falls.[1] Her physician conducted general and neurological evaluations of Smith in March and April 2014, recommended that she move into an assisted living facility, and sent two history and physical reports to DaySpring indicating that she used a walker and required assistance ambulating. DaySpring used these reports in preparing Smith's service plan.

When Smith's daughter, Christine Faber, came to pick Smith up for a hair appointment, Faber asked a DaySpring employee to help Smith to Faber's car. The employee, a Personal Care Assistant, used a rolling walker to wheel Smith down DaySpring's sidewalk. Smith seated herself on the walker, and the employee faced her, pushing Smith backward. A wheel of the walker caught in a crack. The walker tipped over, and Smith hit her head on the concrete. She died about a week later from her injuries.

Faber sued DaySpring. Her original petition included claims for negligence, negligent hiring, and premises liability. In its answer, DaySpring alleged that it is a health care provider under the Texas Medical Liability Act (TMLA or Act). TEX. CIV. PRAC. & REM. CODE §§ 74.001-74.507. Because the TMLA requires a plaintiff to serve an expert report within 120 days of the defendant's original answer, DaySpring moved to dismiss the case after the deadline passed without Faber's serving an expert report. *See id.* § 74.351(a).

---

[1] One DaySpring assessment rated her mobility as "[t]otally independent," while another rated it as "[n]ot always reliable" and described her as a "fall risk."

Faber then amended her petition, removing all references to DaySpring's employee and dropping the claims based on the employee's conduct. What remained was a premises liability claim alleging that "[w]hile exiting [DaySpring], Ms. Smith's walker suddenly, and without warning, became caught in a large crack in the concrete."

The trial court dismissed Faber's claim, and a panel of the court of appeals affirmed. No. 05-18-00827-CV, 2020 WL 3529514 (Tex. App.—Dallas June 30, 2020), *opinion withdrawn and superseded on reh'g en banc*, 629 S.W.3d 630 (Tex. App.—Dallas 2021). Addressing the seven factors outlined in *Ross*, the panel concluded that Faber's claim was a health care liability claim because the facts showed a violation of safety standards with a "substantive nexus" to the provision of health care. *Id.* at *3-5.

In an 8-5 decision, the en banc court vacated the panel's judgment and reversed the trial court's judgment. 629 S.W.3d at 634. The majority noted that Faber's live pleading alleged only claims based on the condition of DaySpring's sidewalk, and it reasoned that there was no substantive nexus between allegedly negligent sidewalk maintenance and DaySpring's duties as a health care provider. *Id.* at 639-642. Therefore, Faber's claim was not a health care liability claim, and no expert report was needed. *Id.* at 642-43.

## ANALYSIS

We review de novo whether Faber asserted a health care liability claim. *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019). The en banc majority's analysis of this issue was skewed at the outset because it took an overly narrow view of the

4

relevant facts rather than considering the record as a whole. When the walker and the employee's conduct as well as the sidewalk crack are taken into account, we conclude that Faber's cause of action is a health care liability claim.

## I. Legal standards governing whether a cause of action is a health care liability claim

The TMLA requires a claimant who asserts a "health care liability claim" to serve one or more expert reports describing the applicable standards of care, how the defendant's conduct failed to meet those standards, and how those failures caused the claimant harm. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6). If a claimant fails to serve a compliant report within 120 days after the defendant files its original answer, the trial court must dismiss the claim with prejudice and award the defendant attorney's fees and costs. *Id*. § 74.351(b).

### A. Courts must consider the operative facts in the record.

Whether the Act applies turns on the claim's "underlying nature . . . rather than its label." *Weems*, 575 S.W.3d at 363; *Lake Jackson Med. Spa, Ltd. v. Gaytan*, 640 S.W.3d 830, 836-38 (Tex. 2022). To determine a claim's nature, a court must carefully define the universe of relevant facts. How the court does so can significantly affect the outcome of the analysis. *Compare* 629 S.W.3d at 639-643 (considering only DaySpring's conduct alleged to be negligent in the live petition and holding claim is for premises liability), *with id*. at 645-48 (Reichek, J., dissenting) (considering DaySpring's conduct to include employee's actions and concluding claim is health care liability claim).

5

Courts must focus on the set of operative facts "underlying the claim" that are relevant to the alleged injury, not on how "the plaintiff's pleadings describ[e] the facts or legal theories asserted." *Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012). If those facts "*could* support claims against a physician or health care provider for departures from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care," then the TMLA applies "regardless of whether the plaintiff alleges the defendant is liable for breach of any of those standards." *Id.*; *see also Yamada v. Friend*, 335 S.W.3d 192, 193 (Tex. 2010) (holding claims based on same set of "underlying facts" as a health care liability claim are health care liability claims); *PM Mgmt.-Trinity NC, LLC v. Kumets*, 404 S.W.3d 550, 550-52 (Tex. 2013) (same).

The relevant facts are not limited to those alleged in a claimant's live pleading. *Gaytan*, 640 S.W.3d at 838-39.[2] Instead, they should be drawn from the "entire court record," including "pleadings, motions and responses, and relevant evidence properly admitted." *Loaisiga*, 379 S.W.3d at 258.

---

[2] In defining the scope of the set of facts underlying a particular claim, it is useful to recognize that a distinct negligent act or omission by a different party or conduct occurring at a different time that results in a distinct injury may constitute a separate health care liability claim. *See, e.g.*, *Suleman v. Brewster*, 269 S.W.3d 297, 298-300 (Tex. App.—Dallas 2008, no pet.) (holding claimant stated two health care liability claims when she first alleged doctor was negligent regarding pressure sores and, later, negligent regarding cardiology care); *Puls v. Columbia Hosp. at Med. City Dall. Subsidiary, L.P.*, 92 S.W.3d 613, 615, 618-19 (Tex. App.—Dallas 2002, pet. denied) (holding claimant stated distinct health care liability claims when she first alleged perfusionist was negligent and, later, nurses were negligent).

This broad scope of relevant facts helps to promote the Act's consistent and predictable application to the claims of similarly situated plaintiffs and prevent gamesmanship. As we have explained, a "claimant cannot avoid the Act's application by artfully pleading claims for ordinary negligence or premises liability." *Gaytan*, 640 S.W.3d at 838; *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 851 (Tex. 2005); *Ahmadi v. Moss*, 530 S.W.3d 754, 757-58 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Med. Hosp. of Buna Tex., Inc. v. Wheatley*, 287 S.W.3d 286, 291 (Tex. App.—Beaumont 2009, pet. denied).

### B. The *Ross* analysis applies to claims concerning alleged departures from standards that implicate safety.

To determine whether a given set of operative facts could support a health care liability claim, we turn to the language of the Act. *See Rogers v. Bagley*, 623 S.W.3d 343, 350 (Tex. 2021). The Act defines a health care liability claim as

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). This definition includes three essential elements: (1) the defendant is a physician or health care provider; (2) the claim is for treatment, lack of treatment, or another departure from accepted standards of medical care, health care, or

7

safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission proximately caused the claimant's injury or death. *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 179-180 (Tex. 2012).

Faber does not dispute the first element: by statute, DaySpring is a health care provider. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(11)(B) (defining "[h]ealth care institution" to include "an assisted living facility licensed under Chapter 247, Health and Safety Code"); *id*. § 74.001(a)(12)(A)(vii) (defining "[h]ealth care provider" to include "a health care institution"). And Faber has alleged that DaySpring's departure from accepted standards proximately caused Smith's death. Consequently, only the second element is at issue: whether her claim concerns "treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." *Id*. § 74.001(a)(13).

We have recognized various tests for determining whether the set of operative facts underlying a claim concerns an alleged departure from accepted standards of (1) medical care, (2) health care, (3) safety, or (4) related professional or administrative services. For example, claimed departures from medical or health care standards are analyzed under a three-step framework outlined in *Lake Jackson Medical Spa v. Gaytan*, *see* 640 S.W.3d at 844, while claimed departures from safety

8

standards are assessed under a seven-factor test articulated in *Ross v. St. Luke's Episcopal Hospital, see* 462 S.W.3d at 505.[3]

But as we explain below, many claims implicate more than one type of standard. And in some cases, it may be unclear whether a standard implicates health care more than safety, and thus which prong of the definition—and its associated test—applies. For example, the standards that the health care provider relies upon here to argue that the claim falls under the health care prong are defined in terms of safety.

In such cases, parties have briefed—and courts have analyzed—alleged departures from health care standards separately from alleged departures from safety standards. In addition, they have addressed whether a safety standard has a "direct" relationship to the provision of health care separately from whether it has a "substantive nexus" to the provision of health care.

Because a cause of action need only concern a departure from one type of standard for the Act to apply, this approach can be needlessly burdensome. In cases where application of the health care prong is a straightforward exercise, an analysis under the safety prong is unnecessary.

Alternatively, if a claim alleges departures from safety standards as well as health care standards, or if it is unclear whether a standard applicable to a health care provider relates more to safety than to health

---

[3] The concurrence suggests that the time may have come to revisit the *Ross* factors. *Post* at 4-5 (Young, J., concurring). The concurrence acknowledges, however, that no party has asked us to do so in this case. *Id.* at 6. Addressing the issues as framed by the parties, we apply the *Ross* factors below.

care, parties and courts need not spend time and resources trying to parse whether the claim falls on the health care or safety side of the line. Rather, they can simply use our decision in *Ross v. St. Luke's Episcopal Hospital* to assess whether the second element is satisfied. Consequently, we hold that when the operative facts concern alleged departures from (1) health care standards that implicate safety; (2) safety standards with a "direct" relationship to the provision of health care; and/or (3) safety standards with a "substantive nexus" to the provision of health care, parties and courts may address the second element using a single *Ross* analysis.

### 1.    *Ross* applies to all safety-standard claims.

The question whether a set of operative facts implicates an alleged departure from accepted standards of safety ("safety-standard claims") has been analyzed in more than one way. A recurring issue in determining whether claims fall under the safety prong is how closely related the safety standards must be to the provision of health care for the claim to qualify as a health care liability claim. A "direct" relationship to health care is sufficient, but we later explained that it is not necessary. *Tex. W. Oaks Hosp.*, 371 S.W.3d at 185-86; *see Ross*, 462 S.W.3d at 502. Instead, at minimum, there must be a "substantive nexus between the safety standards allegedly violated and the provision of health care." *Ross*, 462 S.W.3d at 504. And *Ross* provided seven nonexclusive factors to assess whether a substantive nexus exists. These factors are:

1.    Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;

10

2. Did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special, medical care was implicated;

3. At the time of the injury was the claimant in the process of seeking or receiving health care;

4. At the time of the injury was the claimant providing or assisting in providing health care;

5. Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;

6. If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; [and]

7. Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

*Id.* at 505.[4]

---

[4] We note that many courts of appeals conducting a substantive-nexus analysis have concluded that a claim is a health care liability claim when a majority of the following three circumstances are present: (1) the claimant is a patient; (2) a health care professional was involved in the alleged departure from accepted standards; and (3) the injury occurred in an area directly related to health care or not generally accessible to the public. *See, e.g.*, *S. Place SNF, LP v. Hudson*, 606 S.W.3d 829, 834-35 (Tex. App.—Tyler 2020, pet. denied); *Univ. of Tex. Med. Branch v. Jackson*, 598 S.W.3d 475, 481 (Tex. App.— Houston [14th Dist.] 2020, pet. denied); *Se. Tex. Cardiology Assocs. v. Smith*, 593 S.W.3d 743, 748 (Tex. App.—Beaumont 2019, no pet.); *Hous. Methodist Willowbrook Hosp. v. Ramirez*, 539 S.W.3d 495, 497, 501 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *E. Tex. Med. Ctr. Gilmer v. Porter*, 485 S.W.3d 127, 131 (Tex. App.—Tyler 2016, no pet.); *Phillips v. Jones*, No. 05-15-00005-CV,

In the wake of *Ross*, it has remained unclear whether courts and litigants should analyze both whether a safety standard is directly related to health care *and* whether it has a substantive nexus to health care. Because standards with a "substantive nexus" to health care have a sufficient relationship to constitute health care liability claims, courts need only conduct the "substantive nexus" analysis under the *Ross* factors; a separate "direct relationship" evaluation is unnecessary.

2. ***Ross* applies to claims that allege departures from health care standards that implicate safety.**

*Ross* has so far been limited to analyzing whether claims involve claimed departures from safety standards. In cases where the facts alleged involve departures from accepted standards of health care as well as safety, courts have viewed the inquiries as distinct and sometimes conducted two analyses.

But the *Ross* factors are capable of analyzing whether a claim involves departures from accepted standards of health care that implicate safety. *Ross* factors two through four and six reference "care" or "health care" and are appropriate for evaluating alleged departures from accepted standards of health care—such as an employee's conduct. Factors five and seven refer to "safety standards" and "safety-related

2016 WL 80561, at *2-3 (Tex. App.—Dallas Jan. 7, 2016, no pet.). On the other hand, claims of sexual assault in a medical setting may present all three circumstances, but they are not health care liability claims. *See Loaisiga*, 379 S.W.3d at 257. Because the parties focus on the *Ross* factors, we have no occasion in this case to consider what role, if any, these circumstances should play in the analysis.

12

requirements" and evaluate alleged departures from safety standards—here, cracks in a health facility's sidewalk. Consequently, courts may use *Ross* to evaluate alleged departures from both safety and health care standards, as well as alleged departures from standards for health care providers that implicate safety.

## II. Faber's cause of action is a health care liability claim.

Applying these standards, we hold that Faber's cause of action is a health care liability claim. In determining the relevant scope of conduct, we are not limited to the negligent conduct alleged in the plaintiff's live petition. *See Gaytan*, 640 S.W.3d at 839. Rather, as discussed above, we consider the entire record to identify the set of operative facts underlying the claim that is relevant to the alleged injury.

Here, those facts include not only the crack in DaySpring's sidewalk but also the actions of DaySpring's employee, the employee's use of the walker, and Smith's status as a recipient of personal care services.[5] If these facts, along with DaySpring's failure to fix the crack,

---

[5] We note that Faber's original petition highlighted the role of DaySpring's employee and the walker. There, she alleged:

> Day[S]pring's lack of supervision and/or training of its employees and failure to enact rules and regulations to ensure the safety of the transport of Day[S]pring patients, such as Ms. Smith, caused and produced Ms. Smith's injuries.
>
> . . .
>
> Defendant Day[S]pring[] failed to care for Ms. Smith's safety in a manner that would have been maintained by a person of ordinary prudence . . . .

could support a health care liability claim, Faber's cause of action is a health care liability claim. *See id*. at 838; *Weems*, 575 S.W.3d at 363, 366 n.37; *Loaisiga*, 379 S.W.3d at 255, 258.

DaySpring offers three theories in support of its position that Faber's premises liability cause of action is a health care liability claim. It argues that the underlying facts involve alleged departures from (1) health care standards that implicate safety; (2) safety standards with a "direct" relationship to the provision of health care; and (3) safety standards with a "substantive nexus" to the provision of health care. Because we have held that the health care prong requires a physician–patient relationship, we focus on the latter two arguments. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 180-81. We use a single *Ross* analysis to assess whether DaySpring is correct.[6]

Our dissenting colleagues contend that the *Ross* analysis is categorically inapplicable here. They reason that DaySpring was not providing health care to Smith because she signed a form acknowledging as much and DaySpring did not furnish treatment to her as part of a

---

These facts are relevant not because Faber's original petition focused on them but because they are a part of the operative facts underlying the claim regardless of how—or whether—they factored into Faber's petition. Had Faber originally limited her pleading to the defective sidewalk crack without mentioning DaySpring's employee or the walker, our analysis would be no different.

[6] As DaySpring's theories involve departures from accepted standards of health care *and* safety, we primarily use factors two, three, and six to evaluate the alleged departures from accepted standards of health care that implicate safety: the employee's conduct and the use of a walker. And we look primarily to factors five and seven to analyze deviations from alleged safety standards: Faber's allegations relating to the sidewalk crack.

14

physician's provision of medical care. *Post* at 14-15 (Boyd, J., dissenting). Thus, in their view, DaySpring's alleged violations of safety standards lack a substantive nexus to the provision of health care. *Id.* at 15-17, 21. But neither *Ross* nor the Act supports this view of the safety prong. Indeed, the dissent's approach would supersede the *Ross* factors by imposing a strict rule that the safety prong never applies unless the defendant health care provider's negligent act or omission occurred during and as part of the provision of medical care by a physician.

That approach rewrites the Act and contradicts our precedent. We have held that although a claim alleging a "breach of health-care or medical-care standards 'must involve a patient-physician relationship'" to qualify as a health care liability claim, a claim alleging a "breach of safety, professional-services, or administrative-services standards" need not. *Gaytan*, 640 S.W.3d at 841 n.13 (citing *Tex. W. Oaks Hosp.*, 371 S.W.3d at 178-181). One reason for this conclusion is that the Act does not define "safety," so nothing in its text indicates that a physician–patient relationship is required for a claim to fall under the safety prong. To the contrary, the expert report requirement applies to suits by a "claimant," not a patient. TEX. CIV. PRAC. & REM. CODE § 74.351(a); *see Tex. W. Oaks Hosp.*, 371 S.W.3d at 181.

We have held that the word "safety" broadly means "being secure from danger, harm or loss," *Tex. W. Oaks Hosp.*, 371 S.W.3d at 184, though the statutory context in which it is used requires that safety standards "have a substantive relationship with the providing of medical or health care." *Ross*, 462 S.W.3d at 504. Thus, the underlying

15

facts need not indicate that a health care provider was providing medical or health care and did so negligently for a claim to fall under the safety prong. Rather, the safety prong applies when there are facts indicating that the defendant did not follow standards "implicat[ing its] duties as a health care provider . . . to provide for patient safety" as measured by the *Ross* factors. *See id.* at 505. Unlike the dissent, we understand the *Ross* factors to be tools for analyzing whether a safety standard bears the necessary relationship to health care, not considerations that apply only if that relationship is present.[7]

We have also observed that "[t]he breadth of the statute's text essentially creates a presumption that a claim is [a health care liability claim] if it is against a physician *or* health care provider and is based on facts implicating the defendant's conduct during the course of a patient's [medical] care, treatment, *or* confinement." *Loaisiga*, 379 S.W.3d at 256 (emphases added). Thus, to fall under the safety prong, the claim need not be against a physician or involve medical care; it can also be against a health care provider and involve the patient's treatment.[8] The Act defines neither "treatment" nor "patient," but both have ordinary meanings that do not require the active provision of medical care by a physician—much less a physician furnished by the health care provider. Specifically, "treatment" includes management and care to ameliorate a

---

[7] The dissent argues that our opinion suggests a test different from the *Ross* factors for measuring the necessary relationship. *See post* at 3 n.2. For the reasons just explained, we respectfully disagree. *See also infra* note 16.

[8] DaySpring also argues that Smith's residence amounted to confinement, but the record does not support that assertion.

16

medical condition, and a "patient" includes a recipient of professional services directed toward the protection of health.[9]

Here, DaySpring received a license to operate as a health care provider, and it was providing personal care services to Smith to protect her health and ameliorate a particular medical condition identified by her personal physician: her history of falls, which was the very reason her physician recommended that she move to an assisted living facility like DaySpring.[10]  Because DaySpring is an assisted living facility licensed to provide health care, statutes and regulations require it to provide quality care for the physical health and safety of its residents,[11]

---

[9] *See Treatment*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/treatment (last visited June 30, 2023) (defining "treatment" as not only "the action or way of treating a patient or a condition medically or surgically" but also "management and care to . . . ameliorate . . . a medical condition"); *Patient*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/patient (last visited June 30, 2023) (defining "patient" as not only "an individual awaiting or under medical care and treatment" but also "the recipient of any of various personal services"); *Medical Definition of Patient*, MELISSA CONRAD STÖPPLER, MEDICINENET (Mar. 29, 2021), https://www.medicinenet.com/patient/definition.htm (noting "considerable lack of agreement about the precise meaning of the term 'patient,'" which may include—according to the U.S. Centers for Medicare and Medicaid Services—"[a]n individual who is receiving needed professional services that are directed by a licensed practitioner of the healing arts toward maintenance, improvement or protection of health or lessening of illness, disability or pain").

[10] We do not understand the dissent's proposed distinction between treatment "recommended" versus treatment "order[ed]" by a physician. *Post* at 16.  Leaving aside unusual situations such as psychiatrists involved with civil commitments, physicians generally recommend a course of treatment, leaving it up to the patient to decide whether to undertake that treatment.

[11] TEX. HEALTH & SAFETY CODE § 247.026(a), (b)(2) (providing that administrative standards for assisted living facilities must "protect the health and safety of" residents and "ensure quality care").

including safe surroundings[12] as well as staff trained in geriatric-care tasks such as safely assisting ambulation and preventing accidents and falls.[13] The *Ross* factors demonstrate that there is a substantive nexus between this provision of care to a patient on the recommendation of a physician and the alleged violations of safety standards that led to Smith's death.

First, Smith's injuries occurred while a DaySpring Personal Care Assistant (PCA) assisted Smith to her daughter's car. DaySpring's functional assessment and service plan for Smith—which was informed by her personal physician's report—indicated that she had trouble ambulating independently and required staff to provide standby assistance, which the DaySpring PCA undertook to provide. As the en banc dissent explained, "Faber's request that the PCA assist Smith . . . supports the conclusion that Smith sometimes required assistance to walk . . . . [DaySpring] was obligated to provide these services to Smith

---

[12] *See, e.g.*, TEX. HEALTH & SAFETY CODE § 247.0011(a)(7) (providing that assisted living facilities' "quality of care" includes "safe surroundings"); 26 TEX. ADMIN. CODE § 553.103(d)(1) (providing that "[a]n assisted living facility must ensure a . . . walk . . . is of slip-resistive texture and is uniform, without irregularities").

[13] *See* TEX. HEALTH & SAFETY CODE § 247.026(f) (requiring assisted-living facility employees who provide services to geriatric residents to meet minimum geriatric-care training standards); 26 TEX. ADMIN. CODE § 553.253(c)(3)(A), (E) (stating "[a] facility must have sufficient staff" to "maintain . . . safety" and ensure each resident receives "the kind and amount of supervision and care required to meet his basic needs"), (d)(2)(A), (C), (D), (G) (requiring facility to train attendants in "providing assistance with the activities of daily living," "safety measures to prevent accidents and injuries," "fall prevention," and "actions to take when a resident falls"); 40 TEX. ADMIN. CODE § 46.41(b)(1)(H) (requiring facility to assist with "activities related to the care of the client's physical health," including "transferring/ambulating").

to protect her from harm and . . . they were . . . doing so at the time she fell." 629 S.W.3d at 646 (Reichek, J., dissenting).

Second, the location of the injuries similarly favors a finding that Faber's claim is a health care liability claim. We agree with the en banc dissent that

> [u]nlike a convalescence or nursing facility, the sine qua non of an assisted living facility is a resident's right to remain a part of the community beyond the facility. *See* TEX. HEALTH & SAFETY CODE § 247.064(b)(8) (resident has right to highest level of independence, autonomy, and interaction with community of which resident is capable).

*Id.* As DaySpring's executive director described, the location of the sidewalk crack was

> outside DaySpring's front entrance. This is a location where DaySpring's residents are commonly transported and transferred into vehicles so they may attend activities in the outside community. It was a path where residents gained access to a car for handicap accessibility . . . . DaySpring had an obligation to prevent falls in this area of the front entrance when staff assistance is requested. For many residents, Personal Care Assistants, along with assistive devices, are provided to prevent falls when residents are cared for in this area outside the front entrance.

Third, the executive director's description also shows that Smith was receiving health care from the PCA at the time of her injury. DaySpring is a health care provider by statute, and it had an obligation to "provide or assist with . . . activities related to the care of the client's physical health" identified on the service plan, which for Smith included

19

"ambulating." 40 TEX. ADMIN. CODE § 46.41(b)(1), (b)(1)(H).[14] As explained above, this personal care assistance is "treatment" of a "patient" that was being provided on the recommendation of Smith's physician. And Smith was receiving that treatment from the PCA at the time she fell. The fourth factor is inapplicable.[15]

Fifth, the negligence at issue is based on safety standards arising from professional duties owed by the health care provider. DaySpring is an assisted living facility licensed under Texas Health and Safety Code Chapter 247. *See* TEX. HEALTH & SAFETY CODE § 247.021. It is classified as a Type B facility and provides food, shelter, and services for a patient community in need of personal care, particularly ambulation assistance. *See* 26 TEX. ADMIN. CODE §§ 553.5(c), 553.7(a), 553.9. Statutes and regulations require DaySpring to provide minimum acceptable levels of care and protect resident health and safety; these

---

[14] There is no dispute between the parties that this rule applies to DaySpring. Our dissenting colleagues disagree, arguing that the rule applies only to an assisted living facility that contracts with the government to provide care to certain clients, and DaySpring did not provide services to Smith under such a contract. *Post* at 18 n.9. We need not decide whether the dissent is correct because other statutes and regulations include parallel requirements that an assisted living facility follow standards that "protect the health and safety" of residents, supervise and oversee their "physical . . . well-being," and, as required by the resident's individual service plan prepared by the facility, provide "assistance with . . . moving" and "transferring." TEX. HEALTH & SAFETY CODE §§ 247.002(5), 247.026(a); 26 TEX. ADMIN. CODE §§ 553.3(61), 553.5(c), 553.9(2); *see also* 26 TEX. ADMIN. CODE § 553.259(b)(1)-(2).

[15] In a particular case, the claimant will usually be seeking or receiving health care, or providing or assisting in providing health care, but not both. Thus, courts have recognized that if either factor supports the conclusion that a claim is a health care liability claim, evaluation of the other factor is unnecessary. *See, e.g.*, *Univ. of Tex. Med. Branch*, 598 S.W.3d at 481 & n.3; *E. Tex. Med. Ctr. Gilmer*, 485 S.W.3d at 131 & n.3.

include obligations to maintain safe surroundings, understand its residents' needs for care and services, and meet those needs with appropriately trained staff. *See, e.g.*, TEX. HEALTH & SAFETY CODE §§ 247.0011, 247.026(a), (f); 26 TEX. ADMIN. CODE §§ 553.253, 553.259(a)(1), (b)(1)-(2). Consequently, we use the fifth factor to examine Faber's allegations regarding DaySpring's obligation to maintain its sidewalk in a safe condition as well as the underlying facts regarding DaySpring's obligation to assist with ambulation needs.

Both health care facilities and non-healthcare businesses owe a duty to invitees to maintain premises safe from unreasonably dangerous conditions. When "the injury is one that could have occurred outside a health facility," the line between "what does and does not fall within the coverage of the Act is not always clear." *Se. Tex. Cardiology Assocs. v. Smith*, 593 S.W.3d 743, 747 (Tex. App.—Beaumont 2019, no pet.). But "[t]he pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's duties *as a health care provider*, including its duties to provide for patient safety." *Ross*, 462 S.W.3d at 505 (emphasis added). Here, the relevant question is whether DaySpring—as a health care facility charged with caring for Smith's physical health—violated a duty distinct from one generally owed by businesses to all invitees. In other words, the condition of DaySpring's sidewalk must implicate alleged departures from particular standards related to patient safety. *See id.* at 503 (considering whether "the area had to meet particular cleanliness or maintenance standards related to the provision of health care or patient

21

safety," rather than "the same standards many businesses generally have").

The safety standards DaySpring allegedly violated here are particular to assisted living facilities and, as discussed above, promote the safety of facility residents in an area where they receive care; thus, the fifth factor favors holding that Faber's claim is a health care liability claim. Assisted living facilities have heightened duties of sidewalk maintenance compared to ordinary businesses. *See* 26 TEX. ADMIN. CODE § 553.103(d)(1) (providing that "[a]n assisted living facility must ensure a . . . walk . . . is of slip-resistive texture and is uniform, without irregularities").[16] Because the operative facts underlying Faber's claim include the cracked sidewalk outside DaySpring's entrance, Faber's claim implicates a deviation from a safety standard specific to a

---

[16] The dissent characterizes this requirement as a "physical plant" standard, rather than a standard specific to the needs of facility residents. *Post* at 19. But even if the requirement could properly be labeled a "physical plant" standard, we see no reason why that should make any difference under *Ross*. As we discuss below, it is indisputably a "safety-related requiremen[t] set for health care providers by governmental . . . agencies[.]" *Ross*, 462 S.W.3d at 505. In addition, the requirement that the facility ensure the slip-resistance and uniformity of the walk is a "professional dut[y] owed by the health care provider" that requires more than the ordinary duty of reasonable care, and it applies "in a place" where residents "receiv[e] care" as we have explained. *Id.* Thus, the standard is "substantively related to the safety" of those receiving care. *Reddic v. E. Tex. Med. Ctr. Reg'l Health Care Sys.*, 474 S.W.3d 672, 676 (Tex. 2015) (per curiam). Indeed, it is aimed specifically at ensuring their safety: the point of imposing a special slip-resistance standard for assisted living facilities is to "protect residents" in their care who may "need assistance with movement." TEX. HEALTH & SAFETY CODE § 247.0011(b-1) (providing that department "shall protect residents" by regulating facility construction, maintenance, and operation); 26 TEX. ADMIN. CODE § 553.9(2).

particular type of health care provider—an assisted living facility—rather than a duty owed by businesses generally.

The underlying facts relevant to Smith's injury also include the conduct of DaySpring's PCA, so DaySpring's duties in safely providing ambulatory assistance are relevant to the fifth factor as well. Regulations require DaySpring to conduct a comprehensive resident assessment, prepare a service plan within fourteen days of admission, and provide care according to the plan, including any required assistance with transferring/ambulating as well as transport and escort services. *See id*. § 553.259(b); 40 TEX. ADMIN. CODE § 46.41(b)(1)(H), (b)(3). As noted above, this care must be provided by trained staff. *See supra* note 13. The standard of care for providing such specialized assistance is that of a reasonably prudent assisted living facility and is informed by the applicable statutes and regulations, which provide specific safety standards that such facilities must follow in carrying out their duties as health care providers. *See JSC Lake Highlands Ops., LP v. Miller*, 539 S.W.3d 359, 371 (Tex. App.—Dallas 2016) (analyzing sufficiency of expert report regarding standard of care applicable to assisted living facility), *rev'd*, 536 S.W.3d 510 (Tex. 2017). For all these reasons, the fifth factor indicates that Faber's claim is a health care liability claim.

Sixth, an instrumentality used in providing health care—a rolling walker—was involved in DaySpring's conduct underlying Smith's injury.

> [A] health care provider chose to use Smith's walker as a wheelchair, and, while transporting Smith, the walker became lodged in a crack causing Smith to fall. Just as

23

> patient transport is a type of health care, a wheeled walker, which is used to transport residents at [DaySpring], is an instrumentality used in providing health care. Indeed, Smith's physician noted in his assessment of Smith's suitability for [DaySpring] that she required a walker to "assist" with transfers.

629 S.W.3d at 647 (Reichek, J., dissenting). Whether it is negligent to transport a resident in this manner is a question well suited to expert testimony. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 190. As we have held, "if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim." *Id.* at 182.

Seventh, the allegedly negligent sidewalk condition occurred because DaySpring failed to comply with safety-related requirements set for health care providers by governmental agencies. As noted above, the Texas Administrative Code requires assisted living facilities to "ensure a ramp, walk, or step is of slip-resistive texture and is uniform, without irregularities." 26 TEX. ADMIN. CODE § 553.103(d)(1). Unlike in *Galvan v. Memorial Hermann Hospital System*, there is no indication here that DaySpring's decisions regarding maintenance of its sidewalk would have been motivated by a different, non-healthcare-specific safety standard. *See* 476 S.W.3d 429, 429, 432-33 (Tex. 2015) (holding claim was not health care liability claim when visitor slipped and fell in hallway from water spilling from restroom; hospital's decision to clean water would have been motivated by safety standards applicable to all businesses rather than healthcare-specific standards relating to infection control).

For these reasons, each applicable *Ross* factor supports the conclusion that Faber's cause of action is a health care liability claim. We therefore hold that the Act required her to serve an expert report.

## CONCLUSION

The TMLA's expert-report requirement applies to Faber's cause of action because it constitutes a health care liability claim under our analysis in *Ross*. Given Faber's failure to serve an expert report before the Act's 120-day deadline, we reverse the court of appeals' judgment and render judgment dismissing her claim with prejudice. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b)(2); TEX. R. APP. P. 60.2(c). The Act requires the trial court to award DaySpring its reasonable attorney's fees and costs, *see* TEX. CIV. PRAC. & REM. CODE § 74.351(b)(1), and we remand the case to the trial court for that purpose.

J. Brett Busby
Justice

**OPINION DELIVERED:** June 30, 2023

25